Attestor Value v. Republic of Argentina

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2016

(Submitted: November 21, 2016      Decided: October 18, 2019)

Docket No. 16-1124

_____

ATTESTOR VALUE MASTER FUND, BYBROOK CAPITAL MASTER FUND LP, BYBROOK CAPITAL HAZLETON MASTER FUND LP, TRINITY INVESTMENTS LIMITED, WHITE HAWTHORNE, LLC,

*Plaintiffs-Appellants*,

ARAG-A LIMITED, ARAG-O LIMITED, ARAG-T LIMITED, ARAG-V LIMITED, MCHA HOLDINGS, LLC, HONERO FUND I, LLC, RED PINES LLC, SPINNAKER GLOBAL EMERGING MARKETS FUND LTD, SPINNAKER GLOBAL SPECIAL SITUATIONS FUND LP, YELLOW CRANE HOLDINGS, L.L.C., WHITE HAWTHORNE II, LLC,

*Plaintiffs*,

—v.—

REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

_____

B e f o r e:

KATZMANN, *Chief Judge*, WINTER, *Circuit Judge*, and STEIN, *District Judge*. [1]

_____

Appeal from a final judgment, entered on April 13, 2016, in the United States District Court for the Southern District of New York (Griesa, *J.*), granting defendant Republic of Argentina's motion to dismiss with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and denying as moot plaintiffs' motion for injunctive relief and expedited discovery. The district court dismissed plaintiffs' Amended Complaint because plaintiffs failed to allege that they had entered into valid, countersigned contracts with defendant. The language of the purported contracts expressly required the defendant's countersignature for the contracts to be binding, but defendants never signed the contracts. We hold under this Court's precedents and New York state law that, when an agreement expressly requires a party's countersignature to be binding and the factors set out in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) otherwise indicate that the parties did not intend to be bound, no valid contract exists in the absence of a party's countersignature.

Accordingly, we **AFFIRM** the judgment of the district court.

Judge Winter dissents in a separate opinion.

_____

Peter Sabin Willet (Kenneth I. Schacter, *on the brief*), Morgan, Lewis & Bockius LLP, Boston, MA and New York, NY, *for Plaintiffs-Appellants*.

Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton LLP, New York, NY (Michael A. Paskin, Daniel Slifkin, and Damaris Hernández, Cravath, Swaine & Moore LLP, New York, NY, *on the brief*), *for Defendant-Appellee*.

_____

[1] Judge Sidney H. Stein of the United States District Court for the Southern District of New York, sitting by designation.

PER CURIAM:

After more than a decade of litigation, defendant-appellee the Republic of Argentina (the "Republic") sought to settle with certain holders of its defaulted bonds. Plaintiffs-appellants hold defaulted bonds and claim that they entered into binding settlement agreements with the Republic. The Republic responds that it was not bound by the purported agreements because it did not countersign them. There is no dispute that the Republic never signed the agreements. The question before us is whether the unexecuted agreements were nonetheless binding.

Our precedents and those of the New York Court of Appeals supply a clear answer: "[I]f the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis*, 260 N.E.2d 493, 494 (N.Y. 1970). We generally look to the four factors set out in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985), to determine whether parties intended not to be bound until the formalities of execution were satisfied. In the present case, the first factor is most prominent. The purported agreements between plaintiffs and the Republic

3

expressly require the Republic's countersignature before binding the parties. The other *Winston* factors also indicate that the parties did not intend to be bound in the absence of a countersigned agreement. Accordingly, we affirm the judgment of the district court (Griesa, *J.*).

## BACKGROUND

### A. The Republic's Settlement Proposal

In 2001, the Republic defaulted on bonds issued pursuant to a 1994 Fiscal Agency Agreement. The Republic's default spawned extensive litigation. *See, e.g.*, *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013); *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012). As part of this litigation, the district court entered *pari passu* injunctions barring the Republic from making payments on certain other bonds unless it also made payments on its defaulted bonds.

On February 5, 2016, the Republic published a settlement proposal (the "Proposal") to holders of its defaulted debt. The Proposal presented two offers to holders of defaulted bonds. Bondholders without *pari passu* injunctions could receive the amount of their original principal plus 50% of that principal. Bondholders with *pari passu* injunctions could receive payment of any money

4

judgment or accrued claim against the Republic, less a discount of 30%; if bondholders with *pari passu* injunctions settled by February 19, 2016, this discount would be reduced to 27.5%. The Proposal states that it is "subject . . . to the judicial decision ordering the lifting of the Pari Passu Injunctions." Joint App. 218 (boldface omitted).

On February 17, 2016, the Republic supplemented the initial Proposal with three documents: a set of Instructions for Bondholders to Accept its Settlement Proposal (the "Instructions"), a Master Settlement Agreement, and an Agreement Schedule. The basic plan, as set forth in the Instructions, was for bondholders to complete an Agreement Schedule specific to their holdings, including information about their bonds and the particular amount of money to be paid. Once executed and exchanged, this bespoke Agreement Schedule would become part of a Master Settlement Agreement, which contained standard terms for all bondholders. Specifically, the Instructions state as follows:

> Holders may become a party to a Settlement Agreement by executing and exchanging with the Republic a completed Agreement Schedule . . . . The holder must complete, sign and send the Agreement Schedule to the Republic . . . . That Agreement Schedule, when countersigned by the Republic, shall constitute a binding agreement between the parties to settle all claims in respect of the bonds on the terms contained in the Master Settlement Agreement.

Joint App. 90–91.

5

The language of the Master Settlement Agreement and Agreement Schedule confirms the plan set out in the Instructions. The Master Settlement Agreement contains standard provisions applicable to all settling bondholders, including a provision that New York state law governs the agreement. The Master Settlement Agreement also states:

> This Master Settlement Agreement . . . is made, in accordance with the terms of the Proposal . . . , between [the Republic] and the Holder identified in item (i) of the Agreement Schedule signed by the parties in connection with this Agreement (such Agreement Schedule, when executed and exchanged by the Republic and the Holder, being an integral part of this Settlement Agreement).

Joint App. 92. The Agreement Schedule contains blanks for bondholders to provide personal information and various details about their bonds. It also contains a blank for the monetary settlement amount above a statement that "[t]his Settlement Amount has been reconciled between the Republic and the Holder." Joint App. 97–98. The signature page of the Agreement Schedule states in its entirety: "By executing counterparts of this Agreement Schedule in the space provided below and exchanging those counterparts, the parties agree to be bound by the terms of the Settlement Agreement, as completed by the information contained in this Agreement Schedule." Joint App. 99. Below this text, there are two open lines marked with "/s/" symbols. *Id.*

6

B.  The District Court's Vacatur Order

Soon after the Republic posted the Proposal, it reached settlement agreements with several bondholders. Thereafter, on February 11, 2016, the Republic moved to vacate the *pari passu* injunctions. The district court lacked jurisdiction to lift some of the injunctions due to a pending appeal, but, on February 19, 2016, it issued an Indicative Ruling explaining that the district court would vacate these injunctions if two conditions were met: (1) the repeal of legislative obstacles to the Republic's settlement with its bondholders and, (2) "full payment [by the Republic] in accordance with the specific terms of each . . . agreement" to "all plaintiffs that enter[ed] into agreements in principle with the Republic on or before February 29, 2016." *See* Indicative Ruling at 23, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601-TPG, ECF No. 59 (S.D.N.Y. Feb. 19, 2016).

Upon remand after the Republic voluntarily dismissed two pending appeals, the Republic moved the district court to enter the Indicative Ruling as an order and to lift all of the injunctions. In making this request, the Republic represented to the district court that it had already settled claims worth $6.2 billion and that "[n]egotiations with other plaintiffs are ongoing." Joint App. 120.

7

The Republic also submitted seven settlement agreements in principle to demonstrate its progress. Six of these agreements in principle were countersigned by the Republic, but one, with Red Pines LLC, was not.

On March 2, 2016, the district court entered an order (the "Vacatur Order") implementing its earlier Indicative Ruling and vacating all of the injunctions upon the occurrence of the two conditions set out in the Indicative Ruling, including that the Republic make full payments to all bondholders that entered into agreements in principle before February 29, 2016. *See* Vacatur Order at 5, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601-TPG, ECF No. 76 (S.D.N.Y. March 2, 2016).

C.  The Present Action

Plaintiffs-appellants in the present case are five holders of defaulted bonds. On or before February 29, 2016, per the Instructions, each plaintiff sent the Republic an Agreement Schedule via email. The Republic acknowledged receipt of each plaintiff's submission on February 29, 2016 or March 1, 2016. The Republic did not countersign plaintiffs' Agreement Schedules, and no executed Agreement Schedules were exchanged. On March 11, 2016, the Republic informed plaintiffs that it would not agree to their Agreement Schedules.

8

On March 25, 2016, plaintiffs filed a Complaint seeking a declaratory judgment that they had entered into binding agreements in principle with the Republic by February 29, 2016, such that the Republic had to pay them to lift the *pari passu* injunctions under the terms of the Vacatur Order. Plaintiffs also sought injunctive relief barring the Republic from notifying the district court that all settling bondholders had received full payment, in satisfaction of the Vacatur Order's second condition precedent, without first paying plaintiffs. On April 6, 2016, the Republic moved to dismiss plaintiffs' Complaint, and the following day plaintiffs filed an Amended Complaint with the same claims for declaratory and injunctive relief. The district court expedited briefing on the Republic's motion to dismiss and, in an Opinion dated April 12, 2016, dismissed plaintiffs' Amended Complaint in its entirety. The district court denied plaintiffs leave to amend their pleadings a second time. Plaintiffs timely appealed.

## DISCUSSION

"We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff[s'] favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). "We review

9

the district court's denial of leave to amend the complaint for abuse of discretion." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 169 (2d Cir. 2015).

## A.

Under New York law, "[i]t is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and *signed by both of them*, they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis*, 260 N.E.2d 493, 494 (N.Y. 1970) (emphasis added); *see Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1081 (2d Cir. 1990) ("New York follows the generally accepted rule that when parties negotiating a proposed contract express an intent not to be bound until their negotiations have culminated in the execution of a formal contract, they cannot be held bound until that event has occurred.") (collecting cases, including *Scheck*). "The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed." *R.G. Grp., Inc v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984) (quoting 1 A. Corbin, *Corbin on Contracts* § 30, at 98 (1963)).

10

This Court has set out four factors

> that help determine whether the parties intended to be bound in the absence of a document executed by both sides. The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). In the present case, each of these factors weighs in the Republic's favor.

First, "indications in the proposed settlement agreement that the parties did not intend to bind themselves until the settlement had been signed" must be given "considerable weight." *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 324 (2d Cir. 1997). The text of the Instructions, Master Settlement Agreement, and Agreement Schedule unambiguously require the Republic's countersignature and exchange of executed copies of an Agreement Schedule before either party is bound.[2] The Instructions state that "[h]olders may become a party to a Settlement

---

[2] For this reason, we disagree with the dissent's contention that these various writings collectively constituted an offer to enter into a unilateral contract. "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (Am. Law Inst. 1981); *see also*

Agreement by executing and exchanging with the Republic a completed

Agreement Schedule. . . . [An] Agreement Schedule, when countersigned by the

Republic, shall constitute a binding agreement between the parties . . . ." Joint

App. 90–91. The Agreement Schedule states that "[b]y executing counterparts of

this Agreement Schedule in the space provided below and exchanging those

counterparts, the parties agree to be bound by the terms of the Settlement

Agreement . . . ." Joint App. 99. An Agreement Schedule must be signed by the

Republic to identify the parties to any Master Settlement Agreement, which is

"made . . . between [the Republic] and the Holder identified in item (i) of the

Agreement Schedule signed by the parties in connection with this Agreement

(such Agreement Schedule, when executed and exchanged by the Republic and

the Holder, being an integral part of this Settlement Agreement)." Joint App. 92.

By their own express terms, the unexecuted agreements between the Republic

---

*Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 123 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000) (per curiam). If the surrounding circumstances indicate otherwise, even "the word 'offer' does not necessarily mean that an offer is intended." Restatement, *supra*, § 26 cmt. c. Here, the express requirement that the Republic countersign the Agreement Schedule before either party would be bound gave plaintiffs "reason to know" that the writings did not constitute an offer.

12

and plaintiffs were not binding contracts.[3]

The second *Winston* factor concerns "whether there has been partial performance of the contract." *Winston*, 777 F.2d at 80. Plaintiffs argue that they partially performed the contract by representing to the district court that they had reached agreements in principle with the Republic and that the Republic partially performed the contract by representing to the district court that it had settled with other parties and seeking vacatur of the *pari passu* injunctions. These actions do not amount to partial performance of the settlement agreements. Regardless of their representations to the district court, plaintiffs did not withdraw their claims against the Republic. The Republic did not make any payments to plaintiffs, and neither its settlements with other bondholders nor its efforts to vacate the *pari passi* injunctions bear on its intentions with respect to plaintiffs. The second *Winston* factor thus weighs against plaintiffs.[4]

---

[3] The Republic's submission to the district court of its agreement with Red Pines LLC as an example of an agreement in principle, even though it had not countersigned the agreement, does not bear on the Republic's intentions vis-à-vis the present plaintiffs-appellants. In addition, the submission of an agreement lacking a countersignature does not affect the unambiguous language of the agreements.

[4] Our dissenting colleague concludes otherwise based on *Teachers Insurance & Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491, 502 (S.D.N.Y. 1987), in which the district court held that allocation of funds for a loan agreement

We have framed the third *Winston* factor as "whether there was 'literally nothing left to negotiate.'" *Winston*, 777 F.2d at 82 (quoting *R.G. Grp.*, 751 F.2d at 76). Plaintiffs argue that there was nothing left to negotiate because the terms of the settlement were already set in the Proposal and were never open to negotiation. However, before plaintiffs emailed their Agreement Schedules, the Republic was not aware of how much money plaintiffs believed they should be paid or which bonds would be covered by any agreement. Once the Republic did see plaintiffs' submissions, it disagreed with them about these essential terms. Accordingly, there was still much left to negotiate.

The fourth *Winston* factor asks "whether the agreement at issue here was the type of contract that was usually put in writing." *Winston*, 777 F.2d at 83. Plaintiffs concede that settlement agreements are the type of contract that is usually put into writing. *See, e.g.*, *Ciaramella*, 131 F.3d at 326 ("Settlements of any claim are generally required to be in writing or, at a minimum, made on the

---

constituted partial performance. But that case involved a single contract between two parties, rather than—as here—a multitude of similar contracts between the Republic and various bondholders. It is one thing to say that allocating funds to be loaned to a particular party constitutes partial performance of an agreement with that party. It does not follow, however, that by paying *other* bondholders with whom the Republic had executed binding contracts, the Republic partially performed its obligations towards *plaintiffs*.

14

record in open court."). However, plaintiffs insist that the alleged settlement agreements here were put into writing. Plaintiffs ignore the fact that the written agreements were not signed by the Republic. Because the agreements required countersignatures to be effective, there were no complete written agreements. As we have observed, "[w]ith [millions of dollars] at stake, a requirement that [an] agreement be in writing and signed simply cannot be a surprise to anyone." *R.G. Grp.*, 751 F.2d at 77.

In sum, the parties intended not to bind themselves to any settlement agreement until the relevant documents were executed by both parties and exchanged. Because the Republic did not countersign the agreements, there were no binding settlement agreements between plaintiffs and the Republic.[5] The district court was correct to dismiss plaintiffs' Amended Complaint on these grounds.

---

[5] Because no binding settlement agreements existed between plaintiffs and the Republic, we need not reach plaintiffs' further arguments that depend on the existence of such agreements.

B.

Plaintiffs also argue that the Republic made an irrevocable offer, or

"option contract," through its Proposal. New York General Obligations Law

§ 5-1109 controls irrevocable offers made without consideration:

> when an offer to enter into a contract is made in a writing signed by the offeror, or by his agent, which states that the offer is irrevocable during a period set forth or until a time fixed, the offer shall not be revocable during such period or until such time because of the absence of consideration for the assurance of irrevocability. When such a writing states that the offer is irrevocable but does not state any period or time of irrevocability, it shall be construed to state that the offer is irrevocable for a reasonable time.

Plaintiffs acknowledge that this provision governs the creation of any alleged

agreements between plaintiffs and the Republic. However, the purported

irrevocable offers were not signed by the offeror, the Republic. In addition, the

Proposal, Instructions, Master Settlement Agreement and Agreement Schedule

do not state that they are irrevocable.

Nonetheless, plaintiffs argue that the Republic rendered its offers

irrevocable by asking the district court to vacate the *pari passu* injunctions subject

to the condition that the Republic make payment to all plaintiffs that settled by

February 29, 2016. Even assuming that the Vacatur Order, or any briefing that

discussed it, could alter the terms of the Republic's offers, the Vacatur Order

merely requires the Republic to make payments to all plaintiffs that entered into

agreements in principle on or before February 29, 2016. *See* Vacatur Order at 5,

*NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601-TPG, ECF No. 76

(S.D.N.Y. March 2, 2016). It does not require that the Republic accept all

Agreement Schedules emailed to it by that date without negotiation. *Id.* The

Republic never made irrevocable offers to plaintiffs.

C.

Federal Rule of Civil Procedure 15(a)(2) states that "court[s] should freely

give leave [to amend] when justice so requires." We have upheld Rule 15(a)(2)'s

"liberal standard" as "consistent with our strong preference for resolving

disputes on the merits." *Loreley Fin.*, 797 F.3d at 190 (quoting *Williams v. Citigroup

Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (per curiam)). We have been particularly

skeptical of denials of requests to amend when a plaintiff did not previously

have a district court's ruling on a relevant issue, reasoning that "[w]ithout the

benefit of a ruling, many a plaintiff will not see the necessity of amendment or be

in a position to weigh the practicality and possible means of curing specific

deficiencies." *Id.* However, denial of leave to amend is proper if amendment

would be futile. *Id.* In particular, "[a] plaintiff need not be given leave to amend

17

if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

The district court did not abuse its discretion when it denied plaintiffs leave to amend. Although plaintiffs did not have an opportunity to amend after receiving the district court's ruling granting the Republic's motion to dismiss, plaintiffs have not offered specific changes they could make to their Amended Complaint to cure its deficiencies. In particular, plaintiffs do not represent that they could add an allegation that countersigned settlement agreements existed between plaintiffs and the Republic. As such, amendment would be futile. *Id.*

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

Attestor Value Fund v. Argentina, #16-1124

WINTER, RALPH K., *Circuit Judge,* dissenting:

I would remand for a determination by the district court regarding whether the bonds owned by appellants are eligible to accept the Republic of Argentina's offer of settlement of litigation. My colleagues avoid this issue, which is minor in the overall context of this protracted litigation but at the heart of the present appeal, by broadly and adventurously holding that the detailed "offer," as labeled by the Republic itself, was not an "offer" but rather merely an invitation to bondholders to each make their own offer, each of which the Republic was free to accept or refuse.

a) Summary

The contract before us is not uncommon in contract law. It is known in academic writings as a unilateral contract. *See* ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1.23 (Joseph E. Murray, Jr. ed., 2018) ("A unilateral contract consists of a promise or group of promises made by one of the contracting parties only, usually assented to by the other."). As relevant here, such a contract involves an offer by a promisor to confer a benefit on a promisee who accepts by a specified performance. *See Wachovia Bank of Georgia, N.A. v. Apex Tech of Georgia, Inc.*, 144

B.R. 649, 654 (S.D.N.Y. 1992). Such an offer is binding and enforceable, *I. & I. Holding Corp. v. Gainsburg*, 276 N.Y. 427, 434 (N.Y. 1938), even though there is no meeting of the minds as in a bilateral contract, although the promisor can challenge the adequacy of the requisite performance. An offer of a specified reward for finding a fugitive is enforceable, even though the promisor can claim that the wrong person was discovered and refuse the benefit, subject to a judicial adjudication. *See, e.g.*, *Carlill v. Carbolic Smoke Ball Co.*, 1 Q.B. 256 (Court of Appeal, 1892); *Shuey v. United States*, 92 U.S. 73 (1875).

My colleagues hold that the Republic's "offer" was not binding because it did not meet the *Winston v. Medialive Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1985), test showing a meeting of the minds. But *Winston* does not apply to the enforceability of unilateral contracts, which does not require a meeting of the minds.

Here, a promisor, the Republic of Argentina, made a detailed "offer" -- its chosen word -- to certain known and unknown holders of Argentine bonds on which the Republic had defaulted. The offer contained mathematical formulae for determining the settlement amount and details regarding payment. The offer stated that its effectiveness was conditioned <u>only</u> upon the passage of

2

Argentinean legislation allowing the payments and the lifting by the federal courts of <u>pari passu</u>[1] injunctions that had the effect of denying the Republic of Argentina access to international financial markets.

Each bondholder could accept the offer by establishing its eligibility as a designated promisee. To that end, bondholders had to fill out an application expressly limited by the offer to information concerning: (i) each applicant's ownership of certain Argentina-issued bonds, (ii) the identified bond's eligibility status under the Republic's offer of settlement, and (iii) the calculation of the cash due under the offer on the eligible bonds. The promisor could dispute the eligibility of a party to accept the offer but, if eligibility was shown, the offer would be binding.

The offer stated that a bondholder's signed showing of eligibility to participate in the settlement had to be countersigned by the Republic. My colleagues hold that this countersignature requirement authorized the Republic to repudiate its offer in its entirety by withholding the countersignature and

---

[1]In 2012, the District Court entered the first of several injunctions, ordering that, pursuant to contractual provisions analogous to most "most favored nation" clauses, Argentina make ratable payments to other debt holders whenever it paid on so-called "Exchange Bonds." Additional injunctions issued in 2015. These injunctions made it impossible for Argentina to access the international capital markets. *See, e.g.*, Complaint at ¶¶ 39, 48, NML Capital Ltd. v. The Republic of Argentina, 14-8601 Dkt. No. 1 (March 25, 2016).

leaving eligible bondholders free only to make their own offer to settle. As demonstrated *infra,* this ruling is contrary to the plain language of the offer. It also renders written page after page and written provision after provision of the Republic's offer irrelevant nullities, disregarding the fundamental principle of contact interpretation that every provision be given meaning. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (N.Y. 1956). Moreover, the nullification ignores the facts that these writings were the product of a federal court's mandating of negotiations and that the creation of the writings was supervised by a federal judicial officer, a Special Master. It also ignores the fact that the Special Master,[2] the Republic,[3] and the district court[4] all described the writings as constituting a binding "offer" that bondholders could "accept." The district court even set a terminal date for "acceptance."

---

[2]*See* Daniel A. Pollack, *Statement of Daniel A. Pollack, Special Master in Argentina Debt Litigation*, PR NEWSWIRE, (Feb. 5, 2016, 10:40 PM), https://www.prnewswire.com/news-releases/statement-of-daniel-a-pollack-special-master-in-argentina-debt-litigation-feb-5-2016-300216208.html (last accessed: July 23, 2018) ("Argentina today has released a proposal to settle with and pay the many defaulted Bondholders with cases in the Federal Court of New York pending before Hon. Thomas P. Griesa.").

[3]*See, e.g.*, translated Proposal (February 5, 2016) and Settlement Offer Instructions (February 17, 2016).

[4]*See* Indicative Ruling at 22, NML Capital, Ltd. v. Republic of Argentina, 14-08601, Dkt. No. 59 (February 19, 2016) ("Until February 29, 2016, all FAA bondholders have the right to accept the terms of the Republic's Proposal, and they are certainly free to make counteroffers.").

4

The writings contained now-nullified provisions in which the Republic promised to pay a specific percentage of either the monetary judgment amount or accrued claim value of designated bonds on which it had defaulted. The writings also specifically stated that disputes over the settlement agreement were to be resolved by the district court. These provisions make no sense whatsoever if no binding offer exists.

Moreover, the enforceability of these writings was the explicit basis for the district court's lifting of the injunction, *see* Rule 62.1 Indicative Ruling at 13, NML Capital Ltd. v. The Republic of Argentina, 14-8601 Dkt. No. 59 (Feb. 19, 2016), and for this court's affirming of that lifting, *see* Mandate of the U.S. Court of Appeals for the Second Circuit, 14-8601 Dkt. No. 61 (Feb. 24, 2016). No issue as to the enforceability of these provisions was raised until after the injunction was lifted. No mention of the countersignature requirement was even made before the injunction was lifted except for one occasion when it was explained as a requirement to reflect the Republic's agreement as to the eligibility of an application. The issue in this case, as originally posed by appellees, was quite narrow: Are the bonds in question eligible under the settlement offer given the

5

fact that the bonds by their own terms were time-barred from enforceability?

Indeed, the Republic's performance under the agreement reflects its intent to bind itself. The requisite legislation was passed, and the Republic paid $6.2 billion to bondholders who demonstrated eligibility. On the present record it appears that every bondholder that owned indisputably eligible bonds and accurately applied the offer's mathematical formulae was paid by the Republic. To hold that payment of $6.2 billion and the lifting of an injunction barring a large nation from international capital markets is, as a matter of law, not even part performance indicating the enforceability of written terms lacks logic but surely qualifies as a Guinness record.

To hold that the countersignature requirement repudiates the offer of a binding settlement suggests a massive fraud intended by the Republic, and on, or perhaps even by, the district court. And, because the descriptions of the "offer" above were the basis aggressively argued by the Republic in successfully seeking judicial relief, my colleagues' holding unmistakably violates the doctrines of stare decisis and judicial estoppel.

b) <u>Background</u>

The underlying litigation began in December 2001 with Argentina's default on over $80 billion in external debt. Appellants are holders of bonds issued by Argentina between 1994 and 2001. In 2012, due to continuing violations of the equal treatment provision of the Fiscal Agency Agreement,[5] the district court began entering injunctions ordering that Argentina make ratable payments to other debtholders when it paid on so-called "Exchange Bonds." Because no bank could process payments without risking contempt proceedings, by late 2015, the injunctions made it extremely difficult, actually impossible, for Argentina to access fully international capital markets. The district court ordered negotiations between the parties that were supervised and facilitated by a Special Master appointed by the court.

---

[5] In issuing bonds under the October 19, 1994 Fiscal Agency Agreement ("FAA"), Argentina pledged that it would protect holders of NY-law FAA bonds from subordination and guaranteed equal treatment with respect to payment thereof. The FAA had a provision which stated that "[t]he[se] Securities will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness . . . ." *See* Complaint at ¶ 32, NML Capital Ltd. v. The Republic of Argentina, 14-8601 Dkt. No. 1 (March 25, 2016).

In late 2015, Mauricio Macri was elected President of the Republic of Argentina and resolved to end the debt crisis. In order to accomplish this, he needed an infusion of international capital from new bond financing, but could not obtain it without relief from the pari passu injunctions. Complaint at ¶ 48, NML Capital Ltd. v. The Republic of Argentina, 14-8601 Dkt. No. 1 (March 25, 2016). Therefore, on February 5, 2016, Argentina issued a Spanish press release ("Propuesta" or "Proposal") laying out a proposed framework for settling the claims of holders of defaulted bonds. This framework was the product of the negotiations ordered by the district court and facilitated by the Special Master. On February 17, the Republic supplemented the Proposal by publishing three documents on its website: (a) a "Master Settlement Agreement"; (b) the "Instructions for Bondholders to Accept its Settlement Proposal"; and ( c) an "Agreement Schedule." Some bondholders were expected to use this procedure to settle their dispute with the Republic, while others were expected to seek more favorable terms by making counterproposals. Complaint at ¶ 57. Because it was unknown whether the acceptance of the offer would be sufficiently widespread to justify vacatur of the injunction, the Republic stated its willingness to consider counteroffers if necessary.

8

c) <u>The Writings</u>

The plain language -- and the very titles -- of the multiple writings constituting the settlement agreement indicate beyond any doubt the specificity of the terms of the settlement offer and its intended enforceability.

The purpose of the "Proposal," as stated by the Republic, was to "propose[] a settlement to all holders of the Republic's default bonds."  The designated bonds were described as the "defaulted bonds in which a 'pari passu' injunction" was issued by the district court and which had the effect of denying access to international capital markets by the Republic.  The Proposal stated that holders of such bonds could settle by agreeing

> to receive (i) in the case of such bonds for which a monetary judgment less a discount of 30%, and (ii) in the case of such bonds for which no monetary judgment has been rendered prior to February 1, 2016, the current accrued value of the claims less a discount of 30%.  The discounts referred to in (i) and (ii) will be reduced to 27.5% on settlement agreements in principle executed through February 19, 2016.

The "Proposal" was subject to only two conditions.  It stated:

> This proposal is subject to the approval of the Argentine Congress as well as a decision of the U.S. District Court of the Southern District of

9

New York to lift the <u>pari passu</u> injunction following such approval by the Argentine Congress.

The countersignature requirement was not mentioned in the Proposal.

On February 16, 2016, the Republic issued a long document entitled "Republic of Argentina Master Settlement Agreement." Like the Proposal, it stated terms of the proposed settlement. Section 2 stated "Subject to satisfaction of the conditions set out in Section 6 below, on the Closing Date the Republic shall pay to the Holder, in full settlement of the Holder's claims under the Bonds, the Settlement Amount." Section 6 is entitled "Conditions." It read:

> The settlement and release contemplated by Sections 2 and 3 above are subject to:
>
> (i) The repeal or abridgement of Law 26,017 (the "<u>Lock Law</u>") and the approval of the terms and conditions of this Agreement by the Argentine Congress.
>
> (ii) The U.S. District Court of the Southern District of New York having permanently lifted all *pari passu* injunctions granted to certain holders of defaulted Argentine bonds.
>
> (iii) No action shall have been taken and no statute, rule, regulation or judicial order shall have been enacted,

10

adopted or issued by any government or regulatory authority that would, as of the Closing Date, prevent any of the actions set forth in this Settlement Agreement from taking place.

In the event that the above conditions are not satisfied during the Closing Period, a closing shall not occur, this Settlement Agreement shall terminate, and the parties shall have no further obligations to each other under this Settlement Agreement.

Section 6 made no mention of the Republic's retention of any discretion to reject an acceptance of the settlement proposal by holders of eligible bonds so long as the specified conditions are met. The Republic's countersignature was not such a condition.

A third document, entitled "Instructions for Bond Holders to Accept its Settlement Proposal," was issued by the Republic of Argentina's Ministry of Finance and Public Credit. This related to a document attached to the Master Settlement Agreement entitled "Agreement Schedule" to be "signed by the parties in connection with this Agreement." A form, Agreement Schedule, was attached to the Master Settlement Agreement. It required that owners of bonds identify themselves, provide specifics as to the bonds held, and calculate the

11

"Settlement Amount."  In that regard, the Instructions stated:

> The holder must provide the Republic with (i) the information about its bonds called for by the attachment to the forms of Agreement Schedule contained in the Master Settlement Agreement and (ii) the holder's calculation of the Settlement Amount for its bonds as called for by item 5 below.

Section 5 states:

> Injunction Bond Holders that execute and deliver to the email address included hereby an Agreement Schedule prior to 5:00 pm New York time on February 19, 2016 will have the Settlement Amount under options (ii) and (iii) of Section 4 above calculated using a discount of 27.5%.  Those Injunction Bond Holders that execute and deliver to the email address below an Agreement Schedule after 5:00 pm New York time on February 19, 2016 will have the Settlement Amount under options (ii) and (iii) of Section 4 above calculated using a discount of 30%.

> The holder must "complete, sign, and send the Agreement Schedule to the Republic including the information set forth for in item 3 above.  That Agreement Schedule, when countersigned by the Republic, shall constitute a binding agreement between the parties to settle all claims in respect of the bonds on the terms contained in the Master Settlement Agreement.

Section 4 of the Instructions states:

> *If the holder is an Injunction Bond Holder*, it should also indicate how it wishes the Settlement Amount for its Injunction Offer Bonds to be calculated. As described in the February 5, 2016 Proposal, the options of such a holder are:
>
> (i)    the Standard Offer (150% of the original principal amount of its bonds but not exceeding the value of any monetary judgment rendered by a court in respect of those bonds, determined as of January 31, 2016),
>
> (ii)    if a monetary judgment has been entered in respect of its bonds, the original amount of that monetary judgment updated by any applicable post-judgment interest rate accrued through January 31, 2016, less a discount of 30%, and
>
> (iii)    if a monetary judgment has not been entered in respect of the bonds, the current accrued value of the claims (calculated through January 31, 2016) less a discount of 30%.

The plain language, therefore, of the relevant documents stated very specific terms for settlement. The term "Settlement Amount" in the agreement settlement documents did not, as my colleagues assert, allow an applicant to offer

13

any amount that it desired. Rather, the "Instructions," stated that that amount is "the holder's calculation of the settlement amount . . . as called for by item 5" in the "instructions." Section 5 contained the formula for the settlement and is quoted above. The "Settlement Amount," therefore, was limited to a mathematical calculation based on the offer. Indeed, the first paragraph of Section 5 sets dates for acceptance of the offer by submitting an Agreement Schedule based on the mathematical formulae set out in the offer.

The Agreement Schedule contained spaces for the bondholder's signature and the Republic's countersignature just below a statement that the signatures bind the signatories to the Settlement Agreement "as completed by the information [regarding ownership, eligibility of the bonds, and mathematical calculation of the settlement] contained in this Agreement Schedule."

The countersignature requirement is, therefore, found only in a document issued by the Republic entitled "Instructions for Bondholders to Accept its Settlement Proposal." The Agreement Schedule was necessary to identify relevant bondholders, to verify the eligibility of their bonds, and to accurately apply the settlement formulae to those bonds. The Schedule explicitly states that the countersignature requirement is intended to bind the Republic to the

14

"Settlement Agreement, <u>as completed by the information contained in this Agreement Schedule</u>." The countersignature requirement was, therefore, intended only to reflect the Republic's agreement with "the information contained" in the relevant document, not the intention of the Republic to be bound by the offer. The Republic had the right to dispute the eligibility of the bonds described in a Schedule, to dispute the claims of ownership, and to challenge the application's math with regard to the mathematical formulae. The writings explicitly provided that such disputes were to be resolved by the district court. Until the <u>pari passu</u> injunction was lifted, no one on the planet, so far as I can tell, stated the settlement offer to be anything but enforceable. Indeed, the countersignature requirement was of such a limited nature that, in seeking to lift the <u>pari passu</u> injunction, the Republic's motion was supported by an exhibit reflecting a purportedly successful settlement with an Agreement Schedule that had not been countersigned.

Clearly, the requirement of a countersignature by the Republic of Argentina did not reflect its discretionary power to accept a holder's offer of what the holder believed to be a fair settlement. Rather, the countersignature simply reflected the Republic's agreement with regard to the "information"

15

provided as to the ownership of the bonds specified in the agreement schedule, their eligibility under -- inclusion within -- the settlement offer, and the accuracy of the mathematical calculation of the amount according to the formulae quoted above in the instructions.

There is also a record as to the meaning of the countersignature requirement. On February 29, 2018, the Republic of Argentina submitted a supplemental memorandum in support of its motion, by order to show cause, to vacate the <u>pari passu</u> injunctions. NML Capital v. The Republic of Argentina, 14-8601, Dkt. No. 71 (Feb. 29, 2016). Along with this memorandum, the Republic submitted a Second Supplemental Declaration of Argentina's Undersecretary of Finance, Santiago Bausili, dated February 29, 2016. NML Capital v. The Republic of Argentina, 14-8601, Dkt. No. 71(2) (Feb. 29, 2016).

The declaration stated: "As a result of the negotiation process overseen by the Special Master, the Republic has entered into agreements in principle to settle claims made by numerous bondholders." *Id.* at ¶ 6. He then went on to append several such "agreements in principle" as exhibits. Specifically, he stated, "Attached as exhibit 9 is a true and correct copy of the Agreement in Principle between Red Pines LLC and the Republic of Argentina, executed as of February

16

28, 2016." *Id.* at ¶ 13. This document bore the signature of Red Pines, dated February 28, 2016, but lacked a countersignature. NML Capital v. The Republic of Argentina, 14-8601, Dkt. No. 71(11) (Feb. 29, 2016). The Republic explained:

> On February 29, 2016, the Republic mistakenly included in the list of settlements provided to the district court that it had reached an agreement in principle with Red Pines LLC. In fact, while Red Pines signed a form of agreement, which it submitted to the Republic on February 28, 2016 (see A-2017-25), the Republic subsequently determined that the submitted agreement provided for payment with respect to claims that are timebarred. The Republic therefore did not countersign the agreement.

The sole ground asserted at that time -- the indicative ruling promising the lifting of the injunction had not occurred -- concerned only the eligibility of the bonds in question.

d) <u>Contract Law</u>

The plain language of the writings themselves is sufficient to establish the enforceability of the settlement offer. They were also accompanied by many

17

statements of the Republic,[6] of the Special Master[7], and of the district court[8] indicating that the writings constituted a binding offer to settle. The very titles -- "Proposal," "Instructions for Bondholders to Accept the Offer of Settlement" -- establish the nature of the documents. Given my colleagues' ruling, the titles should be changed to "Irrelevant Nullity" and "Invitation to Bondholders to Make an Offer of Settlement."

Pursuant to the court-supervised settlement, on February 11, 2016, the Republic filed its translated Proposal with the district court. *See* Paskin Decl., NML Capital Ltd. v. Republic of Argentina, 14-8601 Dkt. No. 47(1) Ex. J. Both Special Master Daniel A. Pollack and Judge Thomas Griesa treated the Proposal as the end-result of extensive court-supervised settlement negotiations. *See Statement of Daniel A. Pollack, Special Master in Argentina Debt Litigation*, PR

---

[6]*See, e.g.*, translated Proposal (February 5, 2016) and Settlement Offer Instructions (February 17, 2016).

[7]*See* Daniel A. Pollack, *Statement of Daniel A. Pollack, Special Master in Argentina Debt Litigation*, PR NEWSWIRE, (Feb. 5, 2016, 10:40 PM), https://www.prnewswire.com/news-releases/statement-of-daniel-a-pollack-special-master-in-argentina-debt-litigation-feb-5-2016-300216208.html (last accessed: July 23, 2018) ("Argentina today has released a proposal to settle with and pay the many defaulted Bondholders with cases in the Federal Court of New York pending before Hon. Thomas P. Griesa.").

[8]*See* Indicative Ruling at 22, NML Capital, Ltd. v. Republic of Argentina, 14-08601, Dkt. No. 59 (February 19, 2016) ("Until February 29, 2016, all FAA bondholders have the right to accept the terms of the Republic's Proposal, and they are certainly free to make counteroffers.").

NEWSWIRE (Feb. 5, 2016, 10:40 PM), available at

https://www.prnewswire.com/news-releases/statement-of-Daniel-a-pollack-

special-master-in-Argentina-debt-litigation-Feb-5–2016-300216208.html (last

accessed July 11, 2018) (calling the Republic's proposal a "historic breakthrough")

and Rule 62.1 Indicative Ruling at 13, NML Capital Ltd. v. The Republic of

Argentina, 14-8601 (Feb. 19, 2016) (recognizing the proposal as a "[s]ignificantly

changed circumstance[]" that warranted removal of the *pari passu* injunctions.)

My colleagues rely heavily upon *Winston v. Medialive Entertainment Corp.*,

777 F.2d 78 (2d Cir. 1985). Even though it is plain that the *Winston* factors

support the enforceability of the Republic's "offer" (its chosen word), *Winston's*

teachings are expressly limited to determining a meeting of the minds in a

bilateral contract setting. *See id.* at 83 ("[W]e hold that the parties never entered

into a binding settlement agreement. Our conclusion is supported by the

writings and acts of the parties, by the language of the drafts of the agreement,

and by the nature of the agreement itself."). *Winston* is most useful in

determining whether two parties have reached an unwritten agreement; it

simply has no relevance to the unilateral offer of settlement made after court-

19

mandated negotiations supervised by a special master. *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007) (holding a settlement agreement entered into on the record in open court is enforceable, even if never reduced to writing).

But even when the *Winston* factors are considered, all four favor the appellants' position and demonstrate that an enforceable offer of settlement existed.

(i)  Express Reservation

*Winston* holds that "if either party communicates an intent not to be bound until he achieves a fully executed document" then a contract will not have been formed until the written agreement is executed.  777 F.2d at 80.  True enough, but that general proposition hardly settles the issue before us.  The Republic clearly intended to be bound by the explicit terms of the proposed settlement, if the conditions of Argentinean legislation and judicial lifting of the pari passu injunction were fulfilled.  The documents clearly establish that.  Indeed, the writings make no sense except as a binding offer.  Conspicuous by its absence in my colleagues' opinion is an explanation of the meaning or impact of the mathematical formulae and varying dates for acceptance, if the Republic was not bound to accept such offers from eligible bondholders.  *Muzak Corp. v. Hotel Taft*

20

*Corp.*, 1 N.Y.2d 42, 46 (N.Y. 1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect.").

Of course, the fact that the offer is binding does not mean that anyone can walk in off the street and get money from the Argentine treasury. Eligibility to accept the offer must be shown, and the showing's sufficiency can be challenged, but the offer is still binding. There is no indication in any of these materials that the Republic had discretion not to countersign an Agreement Schedule accurately establishing ownership of bonds, the bonds' eligibility to be part of the settlement, and accurately applying the mathematical formulae to those bonds. What is at issue is the familiar circumstance of a binding unilateral offer to multiple offerees who must individually accept.

(ii) Partial Performance

The second *Winston* factor is whether one party has begun to perform under the agreement. 777 F.2d at 82. This is critical because "partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also

21

understands a contract to be in effect." *R.G. Group, Inc. v. Horn & Hardat Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984).

In *Teachers Ins. & Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491, 502 (S.D.N.Y., 1987), the mere act of informally allocating funds for use in a loan agreement constituted partial performance under this prong of the *Winston* test, resulting in enforcement of a loan agreement against a lender. The performance here was not only far beyond that in *Tribune* but also constituted virtually full performance. Vacating the pari passu injunctions was one condition to the enforceability of the offer. With the support of many bondholders, Argentina moved the district court to vacate those injunctions on the basis of the agreement. Memorandum of Law in Support of Order to Show Cause, NML Capital, Ltd. v. Republic of Argentina, 14-8601 Dkt. No. 46 Feb 11, 2016). The district court issued an indicative ruling that the injunctions would be lifted on payments by the Republic pursuant to the offer.[9] As of March 2, 2016, the Republic had reached settlements based on the agreement documents with bondholders resolving over 85% of the claims held by parties with injunctions. Op. & Order at 4, NML

---

[9] Rule 62.1 Indicative Ruling at 13, NML Capital Ltd. v. The Republic of Argentina, 14-8601 Dkt. No. 59 (Feb. 19, 2016).

22

Capital, Ltd. v. Republic of Argentina, 14-8601, Dkt. No. 76 (Mar. 2, 2016). The Republic paid $6.2 billion pursuant to those settlements. On the present record, the Republic paid the full amount required under the writings to every applicant who showed unchallenged ownership of eligible bonds and an accurate application of the mathematical formula to those bonds. The second factor thus weighs decisively in favor of appellants.

(iii) Agreement to All Material Terms

"[I]f the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound" until it has been written out and signed. *Scheck v. Francis*, 260 N.E.2d 493, 494 (N.Y. 1970). "This rule yields, however, when the parties have agreed on all contractual terms and have only to commit them to writing." *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 390 N.E.2d 1143, 1144 (N.Y. 1979) (holding town supervisor had no discretion *not* to sign an agreement, where a provision of the town laws provided that contracts "*[s]hall* be executed by the supervisor in the name of the town after approval by the town board." *Id.* at 1145 (emphasis added)). Where "[a]ll the terms of the contract had been negotiated and agreed upon" and all that remains is the "ministerial" act of counter-signing

23

a contract, a contract is enforceable even though it was not fully executed. *Id.*

Here, all the terms of the Republic's "offer" had already been negotiated and finalized during the Special Master negotiations. The procedure for accepting the Republic's proposal provided all terms, including the settlement amount, were established. Of course, it was expected that some bondholders would find the settlement offer inadequate and that further negotiations with them might be needed to achieve the vacatur of the injunctions. That expectation did not alter the offer. While my colleagues suggest that further negotiations might be needed, such negotiations were contemplated only in the case of bondholders that refused the offer.

As discussed extensively above, the countersignature requirement does not alter this conclusion. By its very terms, it goes only to the information establishing eligibility, as discussed above. Indeed, any such requirement relates only to the contents of the document involved.

(iv) The Customary Form for Such Transactions

The fourth factor mentioned by *Winston* is "whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80. Unlike in *Winston*, the contract here was in writing. Here, the unilateral offer was

24

filed with the district court. This fourth factor also weighs in favor of enforceability.

e) Judical Estoppel and Stare Decisis

My colleagues' opinion ignores the fact that the enforceability of the Republic's offer has been before the district court and our court before and the subject of rulings in each case. The enforceability of that offer was the basis of the vacatur of the pari passu injunctions at the request of the Republic.

The Republic, in seeking a vacatur of the pari passu injunctions, relied heavily upon its intent to be bound by the "offer of settlement" with regard to owners of eligible bonds. The district court, *see* Rule 62.1 Indicative Ruling at 13, NML Capital Ltd. v. The Republic of Argentina, 14-8601 Dkt. No. 59 (Feb. 19, 2016), and our court, *see* Mandate of the U.S. Court of Appeals for the Second Circuit, NML Capital Ltd. v. The Republic of Argentina,14-8601 Dkt. No. 61 (Feb. 24, 2016), relied upon these arguments in granting the vacatur. As a result, the doctrines of judicial estoppel and stare decisis bar the Republic's dramatic shift of position and my colleagues' holding.

The application of the doctrine of judicial estoppel is governed by three factors: "(1) that a party's new position is 'clearly inconsistent' with its earlier

25

position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Intellivision v. Microsoft Corp.*, 484 Fed. App's. 616 at **2 (2d Cir. June 11, 2012) (*citing New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001). "'[C]ourts have uniformly recognized' that the purpose of the doctrine 'is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment,' and because judicial estoppel is designed 'to prevent improper use of judicial machinery,' it is 'an equitable doctrine invoked by a court at its discretion.'" *Id.* (*quoting New Hampshire,* 532 U.S. at 750).

In support of the motion to vacate the pari passu injunctions, Argentina aggressively represented to the district court that the Proposal was an "offer" available to eligible bondholders to "accept." For example, Argentina's Undersecretary of Finance, Santiago Bausili, submitted in support of the motion a declaration to the district court stating:

> 1. Discussions with the Special Master and the Republic's creditors also have resulted in a comprehensive proposal of the Government's

26

intention, upon receiving legislative authority to settle the claims of all outstanding holders of any defaulted bonds.

2.  The Government believes the proposal is both fair to the Republic's creditors and consistent with the Republic's capacity to pay.

3. Under the proposal, **all** holders of defaulted bonds **will** receive the full principal amount of the debt that they hold, plus certain amounts in respect of accrued interest (the "Standard Proposal").  Additionally, under the proposal, holders of defaulted bonds that are subject to the *pari passu* injunction issued by the U.S. District Court for the Southern District of New York may elect, in lieu of the Standard Proposal, to receive (I) with respect to any bonds as to which a monetary judgment has been rendered, 100% of the original amount of that monetary judgment less a discount of 27.5% or 30% depending on when **they execute** the agreements in principle necessary to participate in the proposal, and (ii) with respect to any bonds as to which no monetary judgment has been rendered, the current accrued value of their claims less a discount of 27.5% or 30% also depending on when **they execute** those agreements in principle.

4.  If all bondholders with *pari passu* injunctions were to accept the terms of the proposal it would result in a total payment to them of approximately $6.5 billion against claims of approximately $9 billion.

Declaration of Santiago Bausili at 17, NML Capital Ltd. v. Argentina, 14-8601, Dkt. No. 48 (Feb. 11, 2016) (emphases added). These statements expressly state that the proposal was an offer available to "all bondholders" to "accept," and moreover, that the payment provided to bondholders would be determined on when "they" -- the bondholders -- executed the Agreement Schedule. The countersignature requirement was not even mentioned. The position taken by the Republic is clearly inconsistent with the position it now takes.

The district court clearly relied upon the enforceability of the Republic's order. It issued its indicative ruling on February 19, 2016, endorsing the settlement provisions described above as a "[s]ignificantly changed circumstance[]" warranting removal of the pari passu injunctions. *See* Rule 62.1 Indicative Ruling at 13, NML Capital Ltd. v. The Republic of Argentina, 14-8601, Dkt. No. 59 (Feb. 19, 2016).

Later, the district court heard arguments about whether it should enter its indicative ruling as a final ruling. As part of the submissions, the court considered a supplementary declaration by Argentina's Undersecretary of Finance, Santiago Bausili, dated February 29, 2016, which stated the following:

> Over the past several weeks, I have participated, both personally and through counsel, in

28

> numerous negotiations with holders of defaulted Argentine debt.
>
> · I am familiar with the course, status and outcomes, to date, of those negotiations. As a result of the negotiation process overseen by the Special Master, the Republic has entered into agreements in principle to settle claims made by numerous bondholders.
>
> Attached as Exhibit 9 is a true and correct copy of the Agreement in Principle between Red Pines LLC and the Republic of Argentina, executed as of February 28, 2016.
>
> In aggregate the agreements in principle reached to date represent a commitment by the Republic to pay approximately $6.2 billion to plaintiffs in the cases where this Court has issued injunctions. Negotiations with other plaintiffs are ongoing. I have personally had discussions with a number of plaintiffs, including . . . Attestor Master Value Fund LP.

NML Capital v. The Republic of Argentina, 14-8601, ECF 71(2) (Feb. 29, 2016).

The declaration appended the Red Pines agreement schedule, which was not countersigned. NML Capital v. The Republic of Argentina, 14-8601, ECF 71(11) (Feb. 29, 2016). On March 2, 2016, the court entered a text order lifting the pari passu injunctions, stating:

> The court appreciates the arguments presented by all parties who spoke at yesterday's hearing. And

the court does not take lightly the decision to lift the injunctions. But ultimately, circumstances have changed so significantly as to render the injunctions inequitable and detrimental to the public interest. For the reasons outlined in the indicative Ruling and this order, the court grants the Republic's motions to vacate the injunctions in all actions upon the occurrence of the two conditions precedent: (1) The Republic repeals all legislative obstacles to settlement with the FAA bondholders, including the Lock Law and the Sovereign Payment Law; (2) For all plaintiffs that entered into agreements in principle with the Republic on or before February 29, 2016, the Republic must make full payment in accordance with the specific terms of each such agreement. The Republic must also notify the court once those plaintiffs have all received full payment.

This statement emphasizes the fact that the Republic had represented that it intended to be bound by its "offer" and the court's reliance upon that statement of intent in its vacatur of the pari passu injunction. The injustice of my colleagues' adopting the Republic's reversal of its position is clear.

e) Conclusion

I therefore dissent. I would remand for a determination on the eligibility of appellants' bonds to accept the Republic's offer of settlement. This issue cannot be resolved as a matter of law, at least in the Republic's favor, because it accepted

some bonds similar to those of appellant as eligible and also is alleged to have stated that appellants' bonds are eligible.